[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 12-13952

D.C. Docket No. 2:01-cv-00983-LSC

THOMAS D. ARTHUR,

Petitioner-Appellant,

versus

KIM TOBIAS THOMAS,
Interim Commissioner, Alabama Department of Corrections,
in his official capacity,

Respondent-Appellee.

Appeal from the United States District Court for
the Northern District of Alabama

(January 6, 2014)

Before HULL, MARCUS, and WILSON, Circuit Judges.

HULL, Circuit Judge:

Death row inmate Thomas Arthur appeals the denial of his Federal Rule of

Civil Procedure 60(b)(6) Motion for Relief from Judgment.  Arthur asserts that the

Supreme Court's issuance of its decision in Martinez v. Ryan, 566 U.S. ___, 132 S.

Ct. 1309 (2012), constitutes an extraordinary circumstance under Rule 60(b)(6)

sufficient to justify the reopening of the final judgment in his prior 28 U.S.C.

§ 2254 habeas petition.  After reviewing the record and considering the arguments

presented in the briefs, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND[1]

Most of this opinion recounts the 30-year history of Arthur's conviction for

the murder of Troy Wicker, which involved three jury trials, three direct appeals,

multiple state and federal post-conviction proceedings, and several lawsuits.  This

procedural background, though lengthy, helps demonstrate (1) why we must affirm

the district court's denial of Arthur's Rule 60(b)(6) motion because Martinez

involves only the procedural default doctrine as to an ineffective-trial-counsel

claim in initial-review state collateral proceedings and does not apply to Arthur's

---

[1]The facts and procedural history are taken principally from the state court's record, the district court's record, and prior relevant decisions in Arthur's case.  See, e.g., Arthur v. Allen, 452 F.3d 1234, modified on reh'g, 459 F.3d 1310 (11th Cir. 2006), cert. denied, 127 S. Ct. 2033 (2007); Arthur v. Allen, 574 F. Supp. 2d 1252 (S.D. Ala. 2008); Ex parte Arthur, 711 So. 2d 1097 (Ala. 1997); Ex parte Arthur, 472 So. 2d 665 (Ala. 1985); Arthur v. State, 71 So. 3d 733 (Ala. Crim. App. 2010), cert. denied, 132 S. Ct. 453 (2011); Arthur v. State, 820 So. 2d 886 (Ala. Crim. App. 2001), cert. denied, 122 S. Ct. 1909 (2002); Arthur v. State, 711 So. 2d 1031 (Ala. Crim. App. 1996), aff'd sub nom. Ex parte Arthur, 711 So. 2d 1097 (Ala. 1997).  Because there have been so many proceedings, it is helpful to recount now in one place what has transpired before.

2

§ 2254 petition that was barred by AEDPA's statute of limitations[2] and (2) in any event, why Arthur has not shown an extraordinary circumstance necessary to proceed under Rule 60(b)(6).

## A.    West Murder Conviction (1977)

Before the 1982 brutal murder of Troy Wicker at issue here, Arthur was convicted in 1977 for the equally brutal murder of Eloise Bray West, the sister of Arthur's common-law wife.  See Ex parte Arthur, 472 So. 2d 665, 669 (Ala. 1985). Arthur killed West at a commercial office during business hours.  When West failed to reveal the location of Arthur's wife, Arthur drew two guns, aimed one at West's head, and said, "[T]ell me where my wife is, or I'm going to blow your head off."  As West picked up the telephone, Arthur fired both guns.  One bullet went into the floor in front of West's desk, one bullet hit a witness in his side, and one bullet struck West in the right eye, killing her nearly instantly.

After a jury trial in 1977, Arthur was convicted of second-degree murder and sentenced to life imprisonment.

---

[2]See Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, §101, 110 Stat. 1214, 1217 (1996) (codified in scattered sections of Title 28 of the U.S. Code, with one-year limitations period codified at 28 U.S.C. § 2244(d)).

**B.      Wicker Murder (1982)**

While serving his life sentence for the West murder, Arthur joined a work release program.  While on work release, Arthur had an affair with Judy Wicker.  In 1982, Judy Wicker offered Arthur $10,000 in exchange for killing her husband, Troy Wicker.  Arthur accepted the offer.

The day before he murdered Wicker, Arthur asked an acquaintance, Patricia Green, for ammunition.  Green obliged.  Arthur told Green that the bullets would be used to kill someone.

On the night of Troy Wicker's murder, Arthur wore an "afro" wig and dark face makeup to disguise himself as a black man.  He then entered Troy Wicker's bedroom while he slept and murdered Wicker by shooting him in the right eye at close range with a pistol.  Troy Wicker died almost instantly.

When officers arrived at the Wicker residence, they found Troy Wicker murdered in his bed; his wife, Judy Wicker, lying on the floor with traces of blood on her face; and Judy Wicker's sister kneeling beside her.  Judy Wicker told investigators that, when she returned home after dropping her children off at school, she found a black man in her home.  She said that the intruder raped her, knocked her unconscious, and shot her husband.

4

After discovering discrepancies in Arthur's work release time and payment logs, an investigation into Arthur's work-release activities began. During a search, $2,000 in cash was found in Arthur's personal belongings. Thereafter, authorities questioned Arthur and, subsequently, arrested him for Troy Wicker's murder. Judy Wicker had collected $90,000 in life insurance proceeds due to Troy Wicker's death and paid Arthur from this sum.

Judy Wicker testified for the prosecution at Arthur's trial. Her testimony recounted the facts described above. Other evidence showed that Arthur had the opportunity and means to kill Troy Wicker. And, evidence—including Arthur's possession of a large amount of cash after the murder—substantiated Judy Wicker's testimony that she hired Arthur to kill her husband. Other evidence also substantiated Judy Wicker's testimony, including her actions on the day of the murder, Arthur's "afro" wig and dark makeup disguise, and Arthur's efforts to dispose of the murder weapon. Expert witnesses testified that the cartridge casings and bullets at the murder scene were consistent with the type of ammunition that Green obtained for Arthur the day before Arthur murdered Troy Wicker.

## C.    First Wicker Murder Conviction (1982-1985)

In three separate state jury trials, Arthur was convicted and sentenced to death for the capital murder of Troy Wicker.

5

In 1985, the Supreme Court of Alabama reversed Arthur's first murder conviction and death sentence. Ex parte Arthur, 472 So. 2d at 669 (holding that details of Arthur's 1977 murder of West were improperly admitted for identification purposes).

## D.    Second Wicker Murder Conviction (1985-1991)

In 1990, the Alabama Court of Criminal Appeals reversed Arthur's second murder conviction and death sentence. Arthur v. State, 575 So. 2d 1165 (Ala. Crim. App. 1990) (holding that the trial court improperly admitted a statement that Arthur made to a police officer in the absence of counsel).

## E.    Third Wicker Murder Conviction (1991)

On June 6, 1991—after the reversal of Arthur's second conviction and sentence—the trial court appointed Harold Walden and William Del Grosso as counsel for Arthur's third trial. The trial court scheduled Arthur's third trial for December 1991.

Immediately before his third trial, Arthur advised the trial court that he was concerned about his appointed counsel, Del Grosso. Although Walden and Del Grosso visited Arthur several times at the prison, Arthur claimed that they had not responded to his many letters and phone calls.

After two complete trials and successful appeals and because of his concerns regarding Del Grosso, Arthur requested leave to participate as co-counsel during

6

his third trial.  The trial court permitted Arthur to act as "co-counsel" with his appointed attorney, Harold Walden, and appointed Joseph Walden as additional co-counsel.  The trial court assigned Del Grosso to serve as "stand-by counsel."

During his third trial, Arthur—in consultation with his court-appointed co-counsel Harold Walden and Joseph Walden—actively conducted much of the voir dire, examinations, and arguments.  Arthur cross-examined all of the prosecution witnesses and presented four defense witnesses.  Arthur did not testify.  Arthur's appointed counsel also actively participated in examining witnesses, delivering opening and closing statements, and making objections.

In December 1991, for a third time, Arthur was convicted for Troy Wicker's murder.

## F.    Third Death Sentence (1991-1992)

During the sentencing phase of Arthur's third trial, Arthur asked the trial court to allow him to personally argue for a capital sentence.  Arthur gave multiple reasons for why he wanted to request a capital sentence.  Arthur believed that, with a capital sentence, he would receive better prison accommodations, more access to the law library, more time to devote to his appeal, a more extensive appeals process, and—based on his prior experience with the capital appellate process—an

7

increased chance for a third reversal.  Arthur also believed that, if he received a capital sentence, the sentence would not actually be carried out.

The state trial court cautioned Arthur against this course of action but, ultimately, allowed Arthur to proceed.  However, the trial court refused to exclude mitigating evidence from the sentencing phase of Arthur's trial.  To that end, the trial court allowed Arthur's court-appointed counsel to argue against a capital sentence.  Arthur's counsel argued for mitigation based on (1) Arthur's good conduct while in prison, (2) Arthur's participation in a program to deter crimes by speaking at high schools, and (3) the disproportionate punishment Arthur faced as compared to the other persons involved in Wicker's murder.

After his counsel argued against a capital sentence, Arthur personally addressed the jury and asked that he be sentenced to death.  Arthur clarified that he did not have a "death wish" and did not believe that he would be executed.  In support of his request for a death sentence, Arthur explained that his two prior murder convictions and death sentences for Wicker's murder were reversed on appeal.  Arthur claimed that a death sentence would give him more time to spend with his children during their prison visits, provide him with a more private cell, and afford him more control over his appeal.

8

The jury returned an advisory verdict of death.  The trial court found that the aggravating factor (i.e., Arthur's 1977 conviction for West's murder) outweighed the mitigating factor (i.e., the culpability of Arthur's un-prosecuted accomplices in Wicker's murder).

On January 24, 1992, the trial court sentenced Arthur to death.  Arthur's trial counsel orally noticed Arthur's appeal.

## G.    Post-Trial Motions (1992)

Although Arthur initially filed an oral pro se motion for a new trial raising ineffective-trial-counsel claims, Arthur and his new appellate counsel ultimately decided not to pursue those claims and proceeded to direct appeal.[3]  Arthur's trial counsel, Harold Walden, also timely filed a motion for a new trial.[4]

At Arthur's request, Arthur's court-appointed trial counsel Harold Walden and Joseph Walden filed a motion to withdraw, which the trial court granted.  The trial court appointed Michael Sanderson to represent Arthur on direct appeal.  The

---

[3]Under Alabama law, "[a] motion for a new trial must be filed no later than thirty (30) days after [the] sentence is pronounced."  Ala. R. Crim. P. 24.1(b).  The trial court may grant a new trial if "the verdict is contrary to law or to the weight of the evidence" or there is any other reason that "the defendant has not received a fair and impartial trial."  Ala. R. Crim. P. 24.1(c).

[4]Unlike Arthur's pro se motion, Walden's initial motion did not assert ineffective trial counsel as a basis for the new trial.  Instead, the counseled motion alleged that (1) the verdict was contrary to the law, the evidence presented, and the weight of the evidence and (2) the trial court admitted illegal evidence.  The counseled motion stated, however, that Arthur would add other grounds when the trial transcript was available.

9

trial court scheduled a hearing on the pending motion for a new trial for March 6 and then rescheduled the hearing for May 1992.

Arthur's court-appointed counsel Sanderson then filed a motion for an extension of time to file a motion for a new trial and indicated that ineffective assistance of trial counsel would be one of the bases for the motion. On April 3, 1992, the trial court granted that motion and scheduled a June 12 motions hearing.

Also on April 3, 1992, Arthur, with the assistance of counsel Sanderson, moved to withdraw Arthur's motion for a new trial. That motion stated: "The Defendant, after conferring with counsel, wishes to withdraw his Motion for a New Trial and direct his attention to the appeal process." The counseled motion stated that Arthur did not intend to present any evidence in support of his motion for a new trial at the May hearing.

On April 16, 1992, Kevin Doyle, of the Alabama Capital Representation Resource Center, and Barry Fisher, of the Southern Center for Human Rights, joined Sanderson as Arthur's counsel.

On May 11, 1992, Arthur, with the assistance of Doyle and Fisher, moved to proceed to appellate review rather than pursue his attempts to receive a new trial. In his counseled motion to the trial court, Arthur stated that his "counsel believes that [Arthur] has meritorious appellate claims[] and that such additional new trial

10

litigation would disadvantage Mr. Arthur by significantly delaying appellate review of his case and the relief from his conviction and death sentence that he expects to obtain." One week later, on May 18, 1992, the trial court granted Arthur's counseled motion to proceed to appellate review.[5]

## H.    Direct Appeal to the Alabama Court of Criminal Appeals (1992-1996)

Arthur, through his new appellate counsel Doyle and Fisher, appealed his Wicker murder conviction and death sentence. Arthur's direct appeal included 145 pages of appellant briefing covering more than 40 claims of error, including these ineffective-trial-counsel claims: (1) the trial court erred in allowing Arthur to act as co-counsel; (2) the statutory fee limit for appointed counsel deprived Arthur of his right to effective counsel; (3) the denial of Arthur's request for funds to investigate possible mitigation evidence deprived Arthur of his right to effective counsel; and (4) the trial court erred in allowing Arthur, acting as co-counsel, to

[5]The trial court noted that, in granting Arthur's request to proceed to appellate review, it was also, consistent with Arthur's request, vacating its April 3 order tolling the running of time for Arthur to file a new motion for a new trial that included ineffective-trial-counsel claims. The trial court observed that, as of May 18, 1992, Arthur had received approximately 1,000 pages of the trial transcript and that the entire transcript would be officially filed by May 29, 1992. In light of Arthur's new counsel, the trial court relieved Sanderson from his duty to represent Arthur.

11

ask the jury for a death sentence without ensuring that Arthur's decision was knowing and voluntary.[6]

Arthur, through his appellate counsel, did not raise any other ineffective-trial-counsel claims (1) even though they could have been raised under Alabama law and (2) even though Arthur's post-trial motions—first submitted pro se and then counseled—suggested that he would raise such claims during his post-trial proceedings.

In May 1995, Fisher withdrew as Arthur's co-counsel. Doyle, of the Alabama Capital Representation Resource Center, remained as court-appointed counsel for Arthur's direct appeal.

In March 1996, the Alabama Court of Criminal Appeals issued a lengthy and thorough opinion affirming Arthur's third murder conviction and death sentence. Arthur v. State, 711 So. 2d 1031, 1042-97 (Ala. Crim. App. 1996), aff'd sub nom. Ex parte Arthur, 711 So. 2d 1097 (Ala. 1997).

Importantly, the appellate court concluded that (1) Arthur "knowingly and voluntarily requested to act as co-counsel and very ably represented himself,"

---

[6]The counseled direct appeal raised many other claims of error that were not raised at trial, such as (1) erroneous admission of certain evidence for lack of foundation or because it was otherwise inadmissible or prejudicial and (2) prosecutorial misconduct for making certain arguments to the jury. However, Arthur did not allege that his trial counsel's ineffectiveness (i.e., such as by failing to object to or stipulating to the evidence) led to or contributed to the claims that he raised on direct appeal.

12

(2) "[t]here was no error by the trial court in allowing him to do so," and (3) the trial court did not err in allowing Arthur to argue in favor of the death penalty. Id. at 1046, 1088 (emphasis added). The appellate court stated that Arthur's "decision to argue in favor of the death penalty was a well thought-out and well reasoned tactical decision based on his vast experience with the criminal justice system." Id. at 1088. After reviewing the trial transcript colloquy between Arthur, his counsel, and the trial judge, the appellate court concluded:

> [Arthur] clearly indicated that, based on his experience, he was making a knowing and intelligent trial strategy decision to seek the death penalty, and he gave reasonable grounds for this decision: his ultimate goal was avoiding the death penalty. In fact, [Arthur] argued for the death penalty in his previous trials, and his strategy proved effective—both earlier convictions were ultimately reversed.

Id. at 1090.

The appellate court also held that the trial court did not err in denying Arthur's request for funds to investigate mitigation evidence because (1) Arthur "stated at trial that he did not wish to present any mitigating evidence during the penalty phase and that he was in favor of the imposition of the death penalty, in view of his experience with the criminal justice system and his ability to appeal his conviction," (2) Arthur "argued for the death penalty in light of the heightened scrutiny given in such cases," and (3) Arthur "made no showing at trial that the

13

assistance of an expert social worker was necessary for an adequate defense or that

he had a particularized need for such assistance." Id. at 1071.  The appellate court

also held that Arthur's claim involving the statutory fee limit was "without merit."

Id. at 1072.

Ultimately, the Alabama Court of Appeals found that Arthur "received a fair

trial" and affirmed his conviction and sentence.  Id. at 1097.  After the appeal,

Doyle withdrew as Arthur's counsel.

## I.     Appeal to the Supreme Court of Alabama (1996-1997)

John Rall, of Boehl, Stopher & Graves in Kentucky, undertook Arthur's

appeal to the Supreme Court of Alabama.  Rall withdrew in April 1997.  Two

weeks later, the court appointed Lajuana Davis to continue with Arthur's appeal.

In his counseled appeal to the Supreme Court of Alabama, Arthur again

raised more than 40 claims.  In November 1997, the Supreme Court of Alabama

affirmed Arthur's third—and current—capital murder conviction and death

sentence.  Ex parte Arthur, 711 So. 2d 1097 (Ala. 1997).  The Supreme Court of

Alabama summarily affirmed the appellate court's opinion on all but two issues:

"(1) whether Arthur's acting as his own co-counsel required a formal colloquy

between Arthur and the trial court and an express waiver of his right to full

14

representation by counsel; and (2) whether Arthur's request for capital punishment was made knowingly and voluntarily." Id. at 1099.

The Supreme Court of Alabama determined that Arthur's decision to act as co-counsel at his third trial was knowing and voluntary:

> Arthur's competency and understanding with respect to his decision to act as co-counsel was shown by his experience in the trial and appellate process. This was Arthur's fourth murder trial, his third for the murder of Troy Wicker. Arthur had been heavily involved in the appeals from his first two convictions for Troy Wicker's murder. He had read both records from the previous trials and had an acute understanding of what he was doing. Accordingly, we conclude that Arthur knowingly and intelligently requested to act as his own co-counsel and that in doing so he implicitly waived full representation of counsel.

Id. (footnote omitted).

The Supreme Court of Alabama also concluded that the trial court did not err in allowing Arthur to request a death sentence because Arthur had calculated and intentional reasons for his request and because he made the decision knowingly, intelligently, and voluntarily:

> Arthur told the jury that if he received a capital sentence, he would get an automatic appeal, that review of the appeal was faster, and that his appeal would be given heightened scrutiny. Arthur also acknowledged that as a prisoner with a capital sentence, he would receive better accommodations and more access to the prison's law library.

15

Arthur's decision to argue in favor of capital punishment was made knowingly, intelligently, and voluntarily. Prior to trial, Arthur wrote a letter to the trial court stating that if found guilty he would ask for capital punishment. Arthur explained to the trial court that he did not have a death wish, but that he would receive numerous practical and procedural advantages if he received a capital sentence. The trial court ensured that Arthur discussed this decision with his co-counsel, who tried to discourage him from such a course. Arthur's decision was based on his previous experience in obtaining reversals of his two earlier convictions and on his experience in prison. Arthur has, in fact, received better treatment in prison. He has had liberal access to the law library. He has received an extra, automatic, review by this Court. . . .

Arthur's tactic clearly shows that he was well informed on the state of the capital punishment system, and we hold that his decision to request capital punishment was a voluntary one.

Id. at 1100 (footnote omitted).

On March 20, 1998, the Supreme Court of Alabama denied Arthur's counseled motion for reconsideration. Attorney Davis represented Arthur in that filing. Arthur was undisputedly represented by counsel through the March 20, 1998, conclusion of his direct appeal in the Supreme Court of Alabama.

On April 7, 1998, the Alabama Court of Criminal Appeals issued a certificate of judgment for Arthur's third conviction and sentence. Arthur claims

16

that he never received a copy of this certificate of judgment, and he asserts that he was not represented by counsel when the certificate issued.

**J.      Petition for Certiorari to the U.S. Supreme Court (1998)**

After the Supreme Court of Alabama denied Arthur's counseled motion on March 20, 1998, Arthur had 90 days to seek a writ of certiorari from the U.S. Supreme Court.  See Sup. Ct. R. 13.  Arthur did not petition the U.S. Supreme Court for a writ of certiorari.  Therefore, Arthur's state capital conviction became final on June 18, 1998, when the 90-day time period expired.

On June 8, 1998, Arthur sent the U.S. Supreme Court a pro se letter, which requested that the U.S. Supreme Court extend the 90-day time period for him to file a petition for a writ of certiorari.  In that letter, Arthur advised that the Supreme Court of Alabama issued its final ruling on March 20, 1998:

> I've been told that I had (90) ninty [sic] days to file some sort of document in the United States Supreme Court when the state supreme court issued a final ruling on the first level of state appeals.
>
> That transpired March 20th 1998.
>
> I was informed of the above filing to the United States Supreme Court a short while back and set about trying to get exact-correct mailing address to the United States Supreme Court – I received this address June 2nd 1998 at 9pm[.]
>
> I had already used my two (2) only per week mailing allowances so I had to wait to mail this to you now.

17

I do not have an attorney but I'm trying desperately to get one using every mailing allowance writing every address I can get my hands on.

Point of this communication

To humbly request the United States Supreme Court to please give me an extension of the 90 ninty [sic] day time limit to file the document for 6 six months or a year in order for me to acquire the representation of an attorney and [for] the attorney [to] have time to familiarize themselves [sic] with my very complex and complicated case to be able to competently file the documents to the court.

If the United States Supreme Court does not want to do this, will the court please grant me personally at least (30) thirty days extension in order for me to try as best I can to prepare something myself to submit?

Respectfully Thomas D. Arthur

On June 19, 1998, in response to Arthur's letter, the Clerk of the U.S. Supreme Court sent Arthur a notice of deficiency. The Clerk's notice informed Arthur that he needed to include a copy of the lower court opinion with his request for an extension of time and that he needed to serve a copy of his request on opposing counsel. The Clerk also notified Arthur that the maximum allowable extension was 60 days. Arthur did not respond to the Clerk's notice of deficiency or file anything further in the U.S. Supreme Court in 1998.

As discussed later, Arthur's state conviction became final on June 18, 1998. Therefore, absent any statutory or equitable tolling, the one-year time period for

18

Arthur to file his federal § 2254 petition expired on June 18, 1999.  As discussed later, Arthur did not file a § 2254 petition until January 25, 2001.

## K.     Two-Year Period from April 1998 to October 2000

Under Alabama law, Arthur had two years—or until April 7, 2000—to file a state post-conviction petition under Alabama Rule of Criminal Procedure 32 ("Rule 32").[7]

It is undisputed that Arthur never filed a motion asking the state courts to appoint him counsel for his Rule 32 proceedings.  Arthur did not want court-appointed counsel because he believed that such counsel would not get paid enough to care about his case.  Arthur also did not file a pro se Rule 32 petition for post-conviction relief, which also would have triggered Alabama's procedural mechanism to appoint counsel.  Instead of asking the Alabama courts for counsel, Arthur undertook a personal and lengthy quest to find pro bono counsel.[8]

---

[7]Alabama's two-year limitations period ran from the date that Arthur's certificate of judgment issued.  Because the Alabama Court of Criminal Appeals issued a certificate of judgment for Arthur's third conviction and sentence on April 7, 1998, Arthur had until April 7, 2000 to bring his Rule 32 petition.

[8]Alabama does not automatically appoint post-conviction counsel to death row inmates. See Ala. R. Crim. P. 32.7(c) (stating circumstances where court must appoint counsel). However, Alabama does "provide[] for the appointment of counsel for a petitioner seeking postconviction relief."  Arthur v. Allen, 452 F.3d 1234, 1250 (11th Cir. 2006).  Specifically, "[a]n indigent petitioner, who desires the assistance of counsel, may seek appointment of counsel if the petitioner's postconviction relief petition is not summarily dismissed."  Id. (citing Ala. R.

19

Beginning in June 1997 and continuing through the fall of 2000, Arthur sought post-conviction counsel by writing letters to organizations and individual attorneys and by posting advertisements on the Internet.  In his letters and Internet postings, Arthur specifically asked that the case not be referred to either the Southern Center for Human Rights in Atlanta or the Equal Justice Initiative of Alabama.  Arthur noted that his past experiences with these organizations were "unpleasant and non-productive," that the organizations did "not have the proper funding or staff to handle" their cases, and that "Alabama's court-appointed attorneys don't get paid enough to care."

The problem for Arthur is that, while he continued his independent quest for counsel, he did not file a pro se state Rule 32 petition, a federal § 2254 petition, or even a request for counsel in any state or federal courts.  See Arthur, 452 F.3d at 1253.  The record shows—and this Court has already concluded—that Arthur was aware of the deadline to file his state Rule 32 and federal § 2254 petitions.  Id. at 1250-51, 1253.  The June 18, 1999, deadline for filing his § 2254 petition came and expired.

_____

Crim. P. 32.7(c)).  After receiving such counsel, the petitioner can amend his petition at any time.  See Ala. R. Crim. P. 32.7(b).

20

## L.    First Rule 32 Petition (2001-2002)

After two and one half years of inactivity by Arthur, in September 2000, the state moved the Supreme Court of Alabama to set an execution date.  In mid- to late-October 2000, Arnold Levine, of The Legal Aid Society in New York, agreed to represent Arthur in his state and federal post-conviction proceedings.  On January 25, 2001 with Levine's assistance, Arthur filed (1) his Rule 32 petition and (2) a motion to file his Rule 32 petition out-of-time.

Arthur's Rule 32 petition (1) alleged constitutional violations and defects in Arthur's third trial and (2) re-raised the argument—from Arthur's direct appeal—that his trial counsel was ineffective in failing to object to Arthur acting as co-counsel.  The Rule 32 petition also alleged generally that Arthur's trial counsel "were legally ineffective at all stages of the criminal proceedings" and "did not render reasonably effective assistance of counsel before, during, or after his [third] capital murder trial and conviction."[9]

---

[9]Specific allegations of the trial counsel's ineffective assistance included "failing to move to dismiss the indictment based on the District Attorney's conflict [of interest], moving to permit Mr. Arthur to act as co-counsel," failing "to adequately investigate the case," failing to move for a continuance when Joseph Walden was appointed as co-counsel on the day of trial, failing "to adequately challenge the state's investigation of the case," failing to obtain necessary expert assistance, failing "to obtain necessary and proper rulings from the trial court through motions and argument," failing to prevent prosecutorial misconduct, and introducing highly prejudicial evidence.

21

Arthur's Rule 32 petition also alleged that his appellate counsel provided ineffective assistance on direct appeal by failing to (1) raise the issue of the prosecutor's conflict of interest and (2) contact the jurors from the third trial.

In March 2001, the state trial court dismissed Arthur's Rule 32 petition as untimely because it was not filed until January 25, 2001, which was well after Alabama's two-year statute of limitations ran on April 7, 2000.  The trial court found that every claim contained in Arthur's Rule 32 petition was precluded by Rule 32's two-year statute of limitations.  Thus, the trial court found that Alabama law precluded it from reviewing the merits of Arthur's untimely claims.

Arthur, with the assistance of attorney Levine, appealed to the Alabama Court of Criminal Appeals, which affirmed the dismissal based on the time bar. Arthur v. State, 820 So. 2d 886, 889-90 (Ala. Crim. App. 2001).  The appellate court found that Arthur filed his Rule 32 petition after the limitations period expired, and, thus, Alabama law did not permit equitable tolling. Id. Alternatively, the appellate court concluded that equitable tolling was inappropriate in Arthur's case. Id. at 890.

The Alabama Court of Criminal Appeals also noted that Arthur's claim that his trial counsel was ineffective for failing to object to Arthur serving as co-

22

counsel "was thoroughly addressed by [the Alabama Court of Criminal Appeals] on Arthur's direct appeal." Id. at 887.

In November 2001, the Supreme Court of Alabama denied Arthur's counseled petition for a writ of certiorari. In 2002, the U.S. Supreme Court denied Arthur's counseled petition for a writ of certiorari. Arthur v. Alabama, 535 U.S. 1053, 122 S. Ct. 1909 (2002). Attorney Levine represented Arthur in both proceedings.

## M.    Federal § 2254 Petition in District Court (2001-2002)

After Arthur's Rule 32 petition was dismissed and while Arthur was appealing that dismissal in the state appellate courts, Arthur filed a federal § 2254 petition with the assistance of counsel Levine on April 20, 2001—seven days before his scheduled execution. On April 25, 2001, the federal district court stayed Arthur's execution and his § 2254 proceedings pending exhaustion of state remedies.

In his § 2254 petition, Arthur alleged, inter alia, (1) numerous claims of ineffective assistance of trial and appellate counsel and (2) trial court error in allowing Arthur to act as "co-counsel" at trial and to request the death penalty.[10]

---

[10]Among other claims, Arthur's § 2254 petition alleged that the trial court erred by failing to determine Arthur's competence to stand trial; failing to grant Arthur a continuance for an

23

In September 2002, attorneys Suhana Han and Theresa Trzaskoma, both from Sullivan & Cromwell in New York, joined Levine as Arthur's § 2254 counsel.

Absent any tolling, Arthur undisputedly filed his § 2254 petition after the federal one-year limitations period expired.  See 28 U.S.C. § 2244(d).  Arthur's murder conviction became final on June 18, 1998, and, thus, the one-year period expired on June 18, 1999.  See id. § 2244(d)(1)(A).  Arthur, however, maintained that this one-year limitations period did not bar his § 2254 petition because he was actually innocent of the murder and/or entitled to statutory or equitable tolling of that period.

## N.    District Court's Dismissal of the Federal § 2254 Petition (2002)

In 2002, the district court dismissed Arthur's § 2254 petition as untimely because it was not filed until April 20, 2001, which was one year, ten months, and two days after the one-year limitations period expired on June 18, 1999.  The

---

investigation and for his attorney to prepare an adequate defense; admitting inadmissible evidence, hearsay, and the testimony of a perjured witness during the guilt phase; improperly removing several prospective jurors; failing to sequester the selected jurors; failing to require the state to comply with Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and failing to provide Arthur with the basic tools to present a defense.  Arthur also argued that his third trial and sentencing were constitutionally defective because the prosecutor had an irreconcilable conflict of interest.

24

district court found (1) "no lawful ground to excuse the untimeliness of the petition," (2) Arthur did not make a showing of actual innocence, and (3) Arthur did not demonstrate any basis for statutory or equitable tolling.

As to actual innocence, the district court found that Arthur had not made a showing of "actual innocence" sufficient to establish a "miscarriage of justice" and avoid AEDPA's time bar. The district court specifically noted that substantial evidence supported Arthur's murder conviction. The district court described that evidence as, inter alia, (1) Arthur's opportunity and means to kill Troy Wicker; (2) Arthur's possession of a large amount of cash after the murder; (3) the many witnesses and circumstances that substantiated Judy Wicker's testimony that she hired Arthur to kill her husband; (4) witnesses to Arthur's "afro" wig and dark makeup disguise; (5) witnesses to Arthur's efforts to dispose of the murder weapon; and (6) the fact that the cartridge casings and bullets were consistent with the type of ammunition that Arthur obtained the day before he murdered Troy Wicker.

Arthur supported his claim of actual innocence with affidavits of two men who provided alibis regarding Arthur's whereabouts on the morning of Troy Wicker's murder. The district court found that, for many reasons, including the fact that the affiants later disavowed their alibi statements, the affidavits that

25

Arthur asked the district court to use in determining the likelihood of his actual innocence were "not sufficiently reliable to cast doubt on the jury's verdict." Ultimately, the district court concluded: "In view of the significant evidence of guilt presented at Arthur's trial, [it was not probable that constitutional error] resulted in the conviction of one who was actually innocent."

As to statutory tolling, the district court concluded that Arthur failed to properly file an application for state collateral review and, thus, no state collateral proceeding tolled the running of the one-year period. See 28 U.S.C. § 2244(d)(2) (permitting tolling for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending"). Arthur asserted that he was entitled to such tolling because—by failing to provide Arthur with state-court appointed post-conviction counsel automatically—Alabama created an unconstitutional impediment to the timely filing of his § 2254 petition. However, the district court determined that Arthur presented no evidence "that he, or any other Alabama death row prisoner who sought post-conviction counsel from the [s]tate," was denied such counsel. The district court concluded that Arthur failed to "avail himself of the Alabama procedures for obtaining post-conviction counsel."

26

The district court also explained that—notwithstanding the state's procedures for providing post-conviction counsel—the federal judicial system had its own procedures for obtaining federal post-conviction counsel for § 2254 cases. Arthur never requested federal habeas counsel and failed to engage that federal procedural mechanism, too.

Because both the state and federal judicial systems provided methods for obtaining post-conviction counsel that Arthur wholly failed to engage, the district court concluded that neither the state nor the federal judicial systems caused Arthur's lack of post-conviction counsel during the one-year limitations period from June 18, 1998 to June 18, 1999. Consequently, Arthur was not entitled to statutory tolling for lack of post-conviction counsel because "the [s]tate did not place any unconstitutional impediment to Arthur's filing of his federal [§ 2254] habeas petition sufficient to statutorily toll the AEDPA limitations period."

As to equitable tolling, the district court found that Arthur's limitations period was not equitably tolled because (1) Arthur failed to ascertain the status of his case; (2) Arthur did not pursue his federal claims with diligence; and (3) no extraordinary circumstances beyond Arthur's control prevented him from filing his § 2254 petition in a timely manner. The district court found that Arthur was aware that, on March 20, 1998, the Supreme Court of Alabama issued a final ruling in

27

Arthur's direct appeal but Arthur did not file his § 2254 petition until April 20, 2001.

Because Arthur did not demonstrate his actual innocence and was not entitled to statutory or equitable tolling, the district court dismissed Arthur's § 2254 petition as untimely.

## O.    Rule 59 Motion in the District Court (2002-2003)

With the assistance of attorneys Levine, Han, and Trzaskoma, Arthur then filed a counseled motion, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure ("Rule 59 motion"), to alter or amend the district court's dismissal of his § 2254 petition.  That motion asserted that the district court erred in not allowing discovery on the questions of actual innocence and equitable and statutory tolling of AEDPA's limitations period.

In 2003, the district court denied Arthur's Rule 59 motion.  The district court concluded that Arthur was not entitled to discovery or an evidentiary hearing because he had not satisfied the requirements of 28 U.S.C. § 2254(e)(2) or Rule 6(a) of the Rules Governing § 2254 Cases.  Specifically, the district court found that § 2254(e)(2) precluded discovery and an evidentiary hearing because Arthur (1) failed to develop a factual basis for his actual innocence claim in state court and (2) did not show diligent efforts to discover the factual basis for such a claim.  The

28

district court concluded that Arthur failed to satisfy Rule 6's requirements because he did not make specific allegations showing a reason to believe that the fully developed facts might entitle Arthur to habeas relief. The district court also emphasized that none of Arthur's requested evidence was new, as each piece of evidence was presented at trial.

## P.    Appeal to this Court (2003-2006)

With the assistance of attorneys Levine, Han, and Trzaskoma, Arthur appealed the dismissal of his § 2254 petition. After reviewing the record and briefs and hearing oral argument, this Court affirmed the dismissal of Arthur's § 2254 petition and the denial of his Rule 59 motion. See Arthur v. Allen, 452 F.3d 1234.

Because the parties agreed that, absent tolling, Arthur's § 2254 petition was untimely, this Court focused on whether statutory or equitable tolling applied. We concluded that AEDPA's limitations period was not tolled statutorily because, inter alia, (1) "Alabama provide[d] for the appointment of counsel for a petitioner seeking postconviction relief"[11] and (2) "an indigent federal habeas corpus petitioner, seeking relief from a judgment punishable by death, has a mandatory

---

[11]Arthur, 452 F.3d at 1250 (citing Rule 32.7(c) for the proposition that "[a]n indigent petitioner, who desires the assistance of counsel, may seek appointment of counsel if the petitioner's postconviction relief petition is not summarily dismissed").

statutory right to appointed counsel from the district court upon filing a motion requesting such appointment." Id. at 1250 (emphasis added).

In concluding that no statutory tolling applied under the facts of Arthur's case, this Court stressed that Arthur failed even to "seek appointment of counsel under Alabama Rule of Criminal Procedure 32.7(c) or 28 U.S.C. § 2254(h)" and failed to provide any reason for not filing a pro se Rule 32 or § 2254 petition while he sought pro bono counsel. Id. We noted that Arthur spent his time seeking pro bono counsel that met his particular requirements instead of filing a pro se Rule 32 or § 2254 petition. Id. at 1250-51. We concluded: "Arthur was aware of time limits for filing his petition and the consequences for missing those times." Id. at 1251. We held that the district court did not clearly err "in finding that Arthur failed to avail himself of the Alabama procedures for obtaining postconviction counsel . . . or abuse[] its discretion in denying Arthur statutory tolling relief." Id. We reached the same conclusion with respect to Arthur's failure to avail himself of the federal procedures for obtaining post-conviction counsel. Id. at 1250.

This Court also concluded that Arthur was not entitled to equitable tolling because he failed to act diligently with respect to the filing of his § 2254 petition. We reasoned that the record did not reflect any "specific actions" that "Arthur took to timely file a petition for postconviction relief, to seek counsel through either the

30

state or federal avenues available to him, to obtain the information regarding the limitations period (or the options for seeking counsel through the state or federal systems) from the prison library or to gain the assistance of others, outside of prison, who had the ability to obtain the information for him." Id. at 1253. Given the lack of evidence of diligence, Arthur was not entitled to equitable relief. Id.

This Court emphasized that Arthur was aware that the Supreme Court of Alabama issued a final ruling in his direct appeal on March 20, 1998 (by the time that he wrote to the United States Supreme Court on June 2, 1998), and he "believed that he had until 20 June 1998 to file his petition for writ of certiorari." Id. at 1252. Because "Arthur was aware of the deadline to file his habeas petition" and because "he neither timely filed a pro se petition for postconviction relief nor filed a motion seeking the appointment of counsel," this Court concluded that the record did not indicate (1) that Arthur engaged in diligent efforts to learn the status of his case or (2) that the actions of others prevented Arthur from timely filing his § 2254 petition. Id. at 1253. We, thus, held that the "district court did not clearly err in finding that Arthur was not entitled to equitable relief."[12]    Id.

---

[12]This Court also rejected Arthur's actual-innocence claim because his evidence was insufficient to make a threshold showing of Arthur's actual innocence and "in no way undermine[d] confidence in the result of his trial." See Arthur, 452 F.3d at 1245-46. We also held that the district court did not abuse its discretion in denying Arthur's requests for discovery

31

Because Arthur failed to show "that he ha[d] any legal grounds excusing the untimeliness of his [§ 2254] habeas petition," this Court affirmed the district court's dismissal of his § 2254 petition as untimely.  Id. at 1253-54.

## Q.    Petition for Certiorari to the U.S. Supreme Court (2007)

In January 2007, Arthur petitioned the U.S. Supreme Court for a writ of certiorari.  Attorneys Levine, Han, Trzaskoma, Jordan Razza (also of Sullivan & Cromwell), and others represented Arthur in this filing.[13]  The Supreme Court denied Arthur's petition.  Arthur v. Allen, 549 U.S. 1338, 127 S. Ct. 2033 (2007).

## R.    Setting and Re-setting Execution Dates (2007-2008)

The State moved the Supreme Court of Alabama to set a new execution date because Arthur's state and federal appeals had concluded.  In June 2007, the

---

and an evidentiary hearing.  Id. at 1253.  We later modified our opinion slightly by adding language to our discussion of Arthur's lack of any entitlement to a hearing and discovery.  See Arthur v. Allen, 459 F.3d 1310, 1310-11 (11th Cir. 2006).

[13]In his counseled petition for a writ of certiorari, Arthur raised these issues:  (1) whether the courts erred in denying Arthur an opportunity to develop his claim of actual innocence by denying Arthur's request for discovery and a hearing; (2) whether AEDPA's limitations period should have been statutorily tolled because his post-conviction claims had never been heard on the merits and Alabama did not provide Arthur with legal assistance or counsel to help prepare his post-conviction petitions; and (3) whether, a "different equitable tolling standard should apply" to AEDPA's limitations period for those death penalty cases where the petitioner never "received any collateral review of his conviction and death sentence" and where the petitioner "diligently pursued his rights."

32

Supreme Court of Alabama set Arthur's execution date for September 27, 2007.

See Ex parte Arthur, 13 So. 3d 49 (Ala. 2007) (table op.).

On September 26, 2007, the day before Arthur's scheduled execution, Alabama's governor granted Arthur a 45-day reprieve to allow the Alabama Department of Corrections time to institute a revision to its lethal injection protocol. In October 2007, the Supreme Court of Alabama set Arthur's execution date for December 6, 2007. See Ex parte Arthur, 25 So. 3d 1203 (Ala. 2007) (table op.).

On December 5, 2007, the day before Arthur's scheduled execution, the U.S. Supreme Court stayed Arthur's execution pending that court's ruling on a challenge to Kentucky's method-of-execution protocol in Baze v. Rees, 553 U.S. 35, 128 S. Ct. 1520 (2008). On June 30, 2008, following the U.S. Supreme Court's decision in Baze, the Supreme Court of Alabama set Arthur's execution date for July 31, 2008. See Ex parte Arthur, 31 So.3d 171 (Ala. 2008) (table op.).

S.    **Second Rule 32 Petition (2008-2009)**

On July 29, 2008, two days before his scheduled execution, Arthur filed an "Emergency Successive Petition for Relief from Conviction Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure" and an "Emergency Motion for Stay of Execution and Access to DNA Evidence Based on Newly Discovered Facts That

33

Completely Exonerate Thomas D. Arthur" (collectively "Second Rule 32 petition"). Attorneys Han, Razza, Qian Gao, and Sultana Bennett represented Arthur in these filings.

On July 30, 2008, the Supreme Court of Alabama stayed Arthur's execution to allow the state trial court time to consider Arthur's Second Rule 32 petition, which again asserted that he was actually innocent of murdering Troy Wicker. Arthur proffered this newly discovered evidence: the confession of his fellow inmate, Bobby Ray Gilbert (who was serving a sentence of life without parole).

The state trial court ordered DNA testing and conducted extensive evidentiary hearings. After reviewing the testimony, evidence, and DNA test results, the trial court found that Gilbert and Arthur had conspired to commit perjury by submitting Gilbert's false confession. The trial court determined that "the overwhelming evidence and testimony presented before th[e] Court established that Gilbert lied, that his affidavit [was] false, . . . that he had no role in the murder of Troy Wicker[,] . . . that the evidence presented demonstrate[d] that both Gilbert and Arthur engaged in an attempt to defraud th[e] Court by means of the affidavit made the subject of [the] Rule 32 [motion], in which Gilbert [took] credit for the murder of Troy Wicker." See Arthur v. State, 71 So. 3d 733, 740-41

34

(Ala. Crim. App. 2010) (quoting from state circuit court's order) (internal quotation marks omitted).

The state trial court concluded, "Gilbert's affidavit would not have changed the result of Arthur's trial[,] and . . . Arthur's claims that he is actually innocent and that his conviction and sentence of death should be vacated are utterly without merit . . . ." See id. at 748-49. In September 2009, the state trial court entered an order that thoroughly addressed each of Arthur's claims and denied his Second Rule 32 petition.

**T.    Appeals of the Denial of the Second Rule 32 Petition (2009-2012)**

On April 30, 2010, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Arthur's Second Rule 32 petition. Id. at 755. Attorneys Suhana Han, Jordan Razza, Andrew Brinkman, and Marc De Leeuw (all from Sullivan & Cromwell) represented Arthur in that appeal. Two weeks later, Arthur, with the assistance of Han and Razza, applied for rehearing, which the Alabama Court of Criminal Appeals denied.

In July 2010, Arthur petitioned the Supreme Court of Alabama for a writ of certiorari. Attorneys Han, Razza, and Brinkman represented Arthur. In his counseled petition, Arthur (1) alleged that the state "appellate court incorrectly construed controlling provisions of the Alabama and Federal Constitutions" and

35

(2) raised multiple issues.[14]  In April 2011, the Supreme Court of Alabama denied Arthur's petition.

In July 2011, Arthur petitioned the U.S. Supreme Court for a writ of certiorari.  Attorneys Han, Razza, Gao, Brinkman, and others represented Arthur.  The Supreme Court denied Arthur's petition.  Arthur v. Alabama, 132 S. Ct. 453 (2011).

In October 2011—more than 10 years after Arthur's first scheduled execution date—the state moved the Supreme Court of Alabama to set a new execution date because his Second Rule 32 proceedings had concluded.  In February 2012, the Supreme Court of Alabama set Arthur's execution date for March 29, 2012.  On March 23, 2012, this Court stayed Arthur's execution "until

---

[14]The issues were (1) whether Arthur's state or federal constitutional rights were violated by the state's failure to disclose that Judy Wicker's rape kit was destroyed; (2) whether Arthur's state or federal constitutional rights would be violated if Arthur was executed in light of the state's destruction of the rape kit; (3) whether Arthur's state or federal constitutional rights were violated by the trial court's refusal to order a comprehensive search for the rape kit, discovery into the circumstances of the destruction of the rape kit, or more advanced DNA testing of the "afro" wig worn by Arthur during the murder; (4) whether Arthur's state or federal constitutional rights were violated by the trial court's failure to grant Arthur relief given that his fellow inmate confessed to the Troy Wicker murder; (5) whether Arthur's state or federal constitutional rights were violated by the trial court's "arbitrary interpretation of scientific tests in a manner inconsistent with the factual record"; and (6) whether the trial court's dismissal of Arthur's Second Rule 32 petition was proper.

36

further order of this Court" for various reasons relating to Arthur's 42 U.S.C.

§ 1983 action challenging Alabama's lethal injection protocol.[15]

## U.    Rule 60(b)(6) Motion (2012-present)

On May 1, 2012, Arthur brought a counseled motion in the district court

pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure ("Rule 60(b)(6)

motion").  That motion sought relief from the district court's December 2002 order

that dismissed Arthur's § 2254 petition as untimely filed in 2001.[16]

In his counseled Rule 60(b)(6) motion, Arthur argued that, in light of the

U.S. Supreme Court's decision in Martinez, the district court should reconsider its

December 2002 decision that dismissed Arthur's § 2254 petition as untimely.  To

satisfy Martinez's direction that a prisoner show that his underlying ineffective-

trial-counsel claim is substantial, Arthur summarized several ineffective-trial-

counsel claims in his Rule 60(b)(6) motion.  He argued that trial counsel failed to

---

[15]From April 2007 until June 2011, Arthur filed five separate and counseled § 1983 actions in federal district court.  The first four actions were dismissed for various reasons.  The fifth § 1983 action challenges Alabama's lethal injection protocol and remains pending.  See Arthur v. Thomas, 674 F.3d 1257 (11th Cir. 2012) (remanding the case for further factual development); Arthur v. Thomas, __ F. Supp. 2d ___, No. 2:11-cv-0438-MEF, 2013 WL 5434694 (M.D. Ala. Sept. 30, 2013).

[16]Attorneys Levine, Han, and Trzaskoma represented Arthur in his Rule 60(b) proceeding.  In May 2012, Jordan Razza re-joined Arthur's team of federal counsel.  In early June 2012, Peter Steciuk, of Sullivan & Cromwell, also joined Arthur's legal team.  On June 6, 2012, Levine and Trzaskoma withdrew as Arthur's counsel, leaving Han, Steciuk, and Razza as counsel.  In November 2013, Razza also withdrew.  Arthur is now represented by Han and Steciuk.

(1) investigate his case properly; (2) prepare a defense properly; (3) ensure that Arthur's decision to represent himself was knowing and voluntary; (4) investigate mitigation adequately; and (5) challenge the prosecutor's conflict of interest.

On June 20, 2012, the district court denied Arthur's motion for several reasons. First, the district court concluded that a change in decisional law by itself was not the type of "extraordinary circumstance" required to trigger Rule 60(b)(6). Second, the district court concluded that "a change in the law, combined with an allegation of ineffective [trial] counsel" was also not an "extraordinary circumstance" sufficient to receive relief under Rule 60(b)(6). Third, the district court concluded that, even if a change in decisional law combined with Arthur's allegation that his trial counsel was ineffective constituted an "extraordinary circumstance" under Rule 60(b)(6), the U.S. Supreme Court's decision in Martinez was not applicable to the facts of Arthur's case for at least three reasons:

> (1) Unlike the petition in Martinez, Arthur's § 2254 petition was not dismissed due to procedural default; rather, Arthur's § 2254 petition was dismissed due to "his complete failure to file a petition, even in a pro se form, within the federal limitation period along with his inability to demonstrate 'actual innocence.'";
>
> (2) Unlike the petitioner in Martinez, Arthur could have "obtained a review of his ineffective-assistance-of-trial-counsel claims with the aid of counsel different from his trial counsel in his direct appeal, as well as in his first [state] collateral challenge"; and

38

(3) Unlike the procedural posture in <u>Martinez</u> (where no final judgment had been entered), the issues in Arthur's case "have been litigated to conclusion"; thus, "to reopen the judgment, [Arthur] must comply with Rule 60(b) by first showing extraordinary circumstances,'" which he failed to do.

This Court granted Arthur a Certificate of Appealabilty on this issue:

> In light of <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012), whether the district court erred in denying Arthur's Fed. R. Civ. P. 60(b)(6) motion seeking relief from the district court's prior judgment dismissing Arthur's federal habeas petition as procedurally barred on time limitations grounds.

## II.  STANDARD OF REVIEW

Arthur requests relief under Rule 60(b)(6) from the district court's 2002 judgment dismissing his § 2254 petition as untimely.  Relief from "judgment under Rule 60(b)(6) is an extraordinary remedy."  <u>Booker v. Singletary</u>, 90 F.3d 440, 442 (11th Cir. 1996) (citing <u>Ritter v. Smith</u>, 811 F.2d 1398, 1400 (11th Cir. 1987)).  Consequently, relief under Rule 60(b)(6) requires showing "'extraordinary circumstances' justifying the reopening of a final judgment."  <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 535, 125 S. Ct. 2641, 2649 (2005) (quoting <u>Ackermann v. United States</u>, 340 U.S. 193, 199, 71 S. Ct. 209, 212 (1950)).  "Even then, whether to grant the requested relief is . . . a matter for the district court's sound discretion."

Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1317 (11th Cir. 2000) (quoting

Booker, 90 F.3d at 442).

"Rule 60(b) proceedings are subject to only limited and deferential appellate

review." Gonzalez, 545 U.S. at 535, 125 S. Ct. at 2649. We review a district

court's denial of a Rule 60(b) motion for an abuse of discretion. Howell v. Sec'y,

Fla. Dep't of Corr., 730 F.3d 1257, 1260 (11th Cir. 2013).

Under the abuse-of-discretion standard, "we will leave undisturbed a district

court's ruling unless we find that the district court has made a clear error of

judgment, or has applied the wrong legal standard." Ameritas Veritable Life Ins.

v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005). "[A]n error of law constitutes an

abuse of discretion." BUC Int'l Corp. v. Int'l Yacht Council Ltd., 517 F.3d 1271,

1275 (11th Cir. 2008) (internal quotation marks omitted).

### III.  DISCUSSION

### A.    Martinez and Trevino Do Not Apply

Arthur's Rule 60(b)(6) motion is based on the U.S. Supreme Court's

decisions in Martinez and Trevino. Arthur asserts that the new rules announced in

Martinez and Trevino (collectively referred to as the "Martinez rule") "excuses"

his failure to file his § 2254 petition within AEDPA's one-year statute of

limitations period and allows him to unravel the district court's 2002 judgment

40

dismissing his § 2254 petition as untimely filed.  We review the <u>Martinez</u> and

<u>Trevino</u> decisions and explain why the <u>Martinez</u> rule does not apply at all to

Arthur's case.

In <u>Martinez,</u> a § 2254 petition asserted ineffective-trial-counsel claims.

Petitioner Martinez acknowledged that he had not raised those claims in state court

and that those claims were barred by the doctrine of procedural default.

Nevertheless, Martinez argued that he had "cause" to excuse his default because

his first state collateral counsel failed to raise Martinez's ineffective-trial-counsel

claims in his first state collateral petition.

The question in <u>Martinez</u> was "whether a federal habeas court may <u>excuse a</u>

<u>procedural default</u> of an ineffective-assistance claim when the claim was not

properly presented in state court due to an attorney's errors in an initial-review

collateral proceeding."  <u>Martinez</u>, 132 S. Ct. at 1313.  After declining to resolve

that question on constitutional grounds, the Supreme Court decided Martinez's

case on equitable grounds based on the "cause and prejudice" exception to the

procedural default doctrine in federal habeas cases.  <u>Id.</u> at 1315, 1319-20.  Under

the procedural default doctrine, if a state prisoner "defaulted his federal claims in

state court <u>pursuant to an independent and adequate state procedural rule</u>, federal

habeas review of the claims is barred unless the prisoner can demonstrate cause for

41

the default and actual prejudice as a result of the alleged violation of federal law . . . ." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991) (emphasis added).  Under the Supreme Court's Coleman decision, even if a petitioner "had no right to counsel to pursue his appeal in state habeas" and even if "attorney error . . . led to the default of [the petitioner's] claims in state court," cause does not exist to excuse the procedural default.  Id. at 757, 111 S. Ct. at 2568.[17]

In Martinez, the Supreme Court announced a "narrow exception" to Coleman's procedural default rule in the limited circumstances where a state law "requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding."  Martinez, 132 S. Ct. at 1315, 1318 (emphasis added). Martinez's narrow exception to Coleman's general rule applies only where (1) a state requires a prisoner to raise ineffective-trial-counsel claims at the initial-

---

[17]Coleman involved a habeas petitioner's contention that his attorney's failure to file a timely notice of appeal in his state habeas proceeding—which resulted in procedural default of the claims raised in that state proceeding—constituted cause to excuse the procedural default in a later federal habeas proceeding.  501 U.S. at 752, 111 S. Ct. 2566.  The Coleman Court held that negligence on the part of a prisoner's post-conviction attorney did not qualify as "cause" sufficient to excuse the procedural default of the habeas claims.  Id. at 753, 111 S. Ct. at 2566-67; see also id. at 757, 111 S. Ct. at 2568 ("Because [the petitioner] had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of [the petitioner's] claims in state court cannot constitute cause to excuse the default in federal habeas."); see also Maples v. Thomas, 566 U.S. ___, ___, 132 S. Ct. 912, 922 (2012).

42

review stage of a state collateral proceeding[18] and precludes those claims during direct appeal; (2) the prisoner did not comply with state rules and failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have counsel (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims) in that initial-review collateral proceeding; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim. Id. at 1318 (defining a substantial claim as one with "some merit"). The Martinez Court emphasized that "[t]he rule of Coleman governs in all but the limited circumstances recognized here." Id. at 1320.

Importantly, the Martinez Court expressly limited its holding to attorney errors in initial-review collateral proceedings, stating, "[T]he holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." Id. As a matter of equity, the Martinez Court held

---

[18]The Supreme Court defined "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." Martinez, 132 S. Ct. at 1315.

43

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

Id. (emphases added). The Martinez rule is not a constitutional rule but an equitable principle.

Subsequently, the U.S. Supreme Court extended Martinez's rule to cases where state law technically permits ineffective-trial-counsel claims on direct appeal but state procedures, as a practical matter, make it "virtually impossible" to actually raise ineffective-trial-counsel claims on direct appeal. See Trevino v. Thaler, 569 U.S. ___, 133 S. Ct. 1911, 1918-21 (2013); see also id. at 1915 (extending Martinez's holding to those state systems that, in actual operation make it "virtually impossible" for an ineffective-trial-counsel claim to be presented on direct review). According to Trevino, where a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, [the] holding in Martinez applies." Id. at 1921 (emphases added). The Trevino Court underscored the narrowness the Martinez rule. Id. (applying Martinez's "narrow exception" to Coleman's general

44

rule); see also Gore v. Crews, 720 F.3d 811, 816 (11th Cir. 2013) ("By its own emphatic terms, the Supreme Court's decision in Martinez is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel" and where, "under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding.").

As our discussion shows, the Martinez rule explicitly relates to excusing a procedural default of ineffective-trial-counsel claims and does not apply to AEDPA's statute of limitations or the tolling of that period. The § 2254 ineffective-trial-counsel claims in Martinez and Trevino were not barred by AEDPA's one-year limitations period. Instead, those § 2254 claims were dismissed under the doctrine of procedural default because the petitioners never timely or properly raised them in the state courts under the states' procedural rules. At no point in Martinez or Trevino did the Supreme Court mention the "statute of limitations," AEDPA's limitations period, or tolling in any way.

The Martinez rule arose from the impact of state rules that (1) did not allow petitioners to raise ineffective-trial-counsel claims on direct appeal (or made it virtually impossible to do so) and (2) required petitioners to bring such claims only in their initial-review collateral proceedings. In Martinez and Trevino, collateral

45

counsel did not raise such claims in the initial-review collateral proceedings but raised them only in a second state collateral review proceedings, which resulted in the claims being procedurally barred under state rules. See Martinez, 132 S. Ct. at 1314; Trevino, 133 S. Ct. at 1915. In Martinez and Trevino, it was how the state rules operated—the rules precluded review of, or a meaningful opportunity to raise, ineffective-trial-counsel claims, triggering a state procedural bar—which created the cause to excuse the state bar.

In contrast, Arthur's case does not involve "cause" under the procedural default doctrine. Arthur's § 2254 petition was dismissed because he filed it well after AEDPA's limitations period expired, and he showed no basis for tolling. See Arthur, 452 F.3d at 1250-54. Arthur's case concerns only the operation of a federal rule—namely, the operation of AEDPA's one-year statute of limitations. It was wholly the operation of AEDPA's federal limitations period—independent of any state procedural rule—that barred Arthur's § 2254 petition. Because Arthur's § 2254 petition was denied due to his complete failure to timely file that § 2254 petition, the Supreme Court's analysis in Martinez and Trevino of when and how "cause" might excuse noncompliance with a state procedural rule is wholly inapplicable here.

46

For all of these reasons, the Martinez rule does not apply at all to Arthur's case. Predicting this result, Arthur asserts that we should broaden the equitable reasoning behind the Martinez rule and apply it to his case. But, any such broadening would ignore the Supreme Court's emphatic statements that the Martinez rule creates only a narrow exception to Coleman's general rule. See Martinez, 132 S. Ct. at 1315 (referring to a "narrow exception"); id. at 1320 (referring to the "limited circumstances" in which its ruling applied and discussing the "limited nature" of the rule); Trevino, 133 S. Ct. at 1921 (applying Martinez's "narrow exception"). Thus, we also hold that the reasoning of the Martinez rule does not apply to AEDPA's limitations period in § 2254 cases or any potential tolling of that period. The narrow exception in the Martinez rule is designed to be hard to meet "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." Martinez, 132 S. Ct. at 1316.

## B.    Arthur Has Not Shown Extraordinary Circumstances

Even assuming that the Martinez rule or the rationale behind that rule were extended to a § 2254 petition barred by AEDPA's limitations period and even assuming that would change the relevant decisional law as to equitable tolling, the U.S. Supreme Court has already told us that a change in decisional law is

47

insufficient to create the "extraordinary circumstance" necessary to invoke Rule 60(b)(6).  See Gonzalez, 545 U.S. at 535-38, 125 S. Ct. at 1249-51; see also Howell, 730 F.3d at 1260-61 (holding that a change in the interpretation of AEDPA's statute of limitations in Holland v. Florida, 560 U.S. 631, 130 S. Ct. 2549 (2010), was not an "extraordinary circumstance").

Similarly, we hold that the change in the decisional law affected by the Martinez rule is not an "extraordinary circumstance" sufficient to invoke Rule 60(b)(6).  We explain why, starting with the facts in Gonzalez.

Under AEDPA, and absent tolling, Gonzalez had to file his § 2254 petition by April 23, 1997.  See Gonzalez, 545 U.S. at 527, 125 S. Ct. at 2645.  Gonzalez filed his petition in June 1997.  Id. at 526, 125 S. Ct. at 2645.  Because Gonzalez's second state post-conviction motion was not "properly filed," the district court concluded that Gonzalez's petition was time-barred and AEDPA's limitations period was not tolled while that motion was pending in state court.  Id. at 527, 125 S. Ct. at 2645; see also 28 U.S.C. § 2244(d)(2) (tolling AEDPA's statute of limitations during the pendency of a "properly filed" application for state post-conviction or collateral review).  Thus, the district court dismissed Gonzalez's § 2254 petition as time-barred.  Gonzalez, 545 U.S. at 526-27, 125 S. Ct. at 2645.

48

In 2001, Gonzalez, pro se, filed a Rule 60(b)(6) motion to alter the district court's prior judgment that his § 2254 petition was time-barred. Id. at 527, 125 S. Ct. at 2645. The district court denied the motion. Id. After this Court affirmed, the Supreme Court granted Gonzalez's petition for certiorari.[19]

The Supreme Court examined what effect its recent decision in Artuz v. Bennett, 531 U.S. 4, 121 S. Ct. 361 (2000), had on Gonzalez's Rule 60(b)(6) motion. Gonzalez, 545 U.S. at 536, 125 S. Ct. at 2650. Artuz concluded that a state post-conviction petition could be properly filed so as to toll AEDPA's limitations period even when all of the claims had been procedurally defaulted. 531 U.S. at 8-9, 121 S. Ct. at 363-64. For the purposes of its Rule 60(b)(6) analysis, the Gonzalez Court assumed that Artuz was a change in decisional law that revealed error in the district court's dismissal of Gonzalez's § 2254 petition as time-barred. Gonzalez, 545 U.S. at 536, 125 S. Ct. at 2650.

Nevertheless, the Supreme Court in Gonzalez held that a change in decisional law—Artuz's changing the interpretation of AEDPA's statute of limitations for a § 2254 petition—did not create an "extraordinary circumstance"

---

[19]This Court affirmed the dismissal but on the alternative grounds that the motion was a successive § 2254 petition. Gonzalez, 545 U.S. at 528, 125 S. Ct. at 2645. After granting Gonzalez's certiorari petition, the Supreme Court first determined that his Rule 60(b)(6) motion was not a second § 2254 petition because it did not present new claims. Id. at 535-36, 125 S. Ct. at 2650. The Supreme Court then affirmed the denial of Gonzalez's Rule 60(b)(6) motion on other grounds, as explained below.

49

under Rule 60(b)(6).  Id.  The Supreme Court stated that (1) the district court's judgment was correct when it was decided and (2) it was "hardly extraordinary" that "after [Gonzalez's] case was no longer pending, this Court arrived at a different interpretation" of AEDPA's statute of limitations.  Id.  The Supreme Court held that the district court correctly denied relief under Rule 60(b)(6).  Id. at 536, 538, 125 S. Ct. at 2650-51.  Gonzalez admonished that extraordinary circumstances warranting the reopening of a judgment "will rarely occur in the habeas context."  Id. at 535, 125 S. Ct. at 2649.

Subsequently, in Howell, this Court applied Gonzalez and explicitly held that a change in the equitable tolling law for AEDPA's statute of limitations does not constitute an "extraordinary circumstance" under Rule 60(b)(6).  Howell, 730 F.3d at 1261.  Howell's § 2254 petition alleged ineffective-trial-counsel claims but was not filed within AEDPA's one-year limitations period.  Id. at 1259-60.  Howell argued that equitable tolling applied because his state-court-appointed collateral counsel filed his state post-conviction motion without leaving sufficient time to file a federal § 2254 petition.  Id.  This Court affirmed the dismissal of Howell's § 2254 petition as untimely because our precedents held that "attorney negligence is not a basis for equitable tolling."  Id. at 1260 (internal quotation marks omitted).

50

Then, the U.S. Supreme Court altered when attorney conduct might equitably toll AEDPA's limitations period.  See Holland, 560 U.S. 631, 130 S. Ct. 2549.  Thus, similar to the Artuz decision, the Holland decision altered the interpretation of tolling under AEDPA's limitations period.

After Holland, Howell filed a Rule 60(b)(6) motion, arguing that his § 2254 petition was timely filed under Holland because his counsel's negligence caused the prior untimely filing and warranted equitable tolling.  Howell, 730 F.3d at 1258.  Denying Howell's motion, the district court relied on Gonzalez and concluded that Holland's change in the interpretation of AEDPA's statute of limitations was not an "extraordinary circumstance" warranting Rule 60(b)(6) relief.  Id. at 1257-58, 1261.  Affirming, this Court too applied Gonzalez and held, "The district court did not abuse its discretion when it read Gonzalez to mean that the change of law in Holland was not an extraordinary circumstance."  Id. at 1261.

In Gonzalez and Howell, the § 2254 petitions—like Arthur's § 2254 petition—were dismissed because they were filed after AEDPA's one-year limitations period expired.  Both Gonzalez and Howell affirmed the denial of Rule 60(b)(6) motions because a change in decisional law related to AEDPA's statute of limitations was not an "extraordinary circumstance" for the purposes of Rule

51

60(b)(6).  Gonzalez, 545 U.S. at 536, 538, 125 S. Ct. at 2650-51; Howell, 730 F.3d

at 1261.

We reach a similar conclusion here:  the change in decisional law created by

the Martinez rule does not constitute an "extraordinary circumstance."  Thus, the

district court did not abuse its discretion when it denied Arthur's Rule 60(b)(6)

motion.  See also Booker, 90 F.3d at 442 ("Something more than a 'mere' change

in the law is necessary to provide the grounds for Rule 60(b)(6) relief." (quotation

marks and alterations omitted)).[20]

Arthur argues that other factors beyond a change in decisional law render the

circumstances here extraordinary.  In particular, he notes that, (1) unlike Gonzalez,

Arthur's case is a death-penalty case and (2) no court has yet considered Arthur's

ineffective-trial-counsel claims on the merits.

But, Arthur overlooks the fact that Howell was a death-penalty case.  And,

like Arthur, Howell did not have his § 2254 petition reviewed on the merits.

Howell, 730 F.3d at 1262 (Jordan, J., concurring).  As to Rule 60(b)(6)'s

---

[20]Because of our holding that any change in decisional law brought about by Martinez
and Trevino is not an extraordinary circumstance to revisit Arthur's § 2254 petition under Rule
60(b)(6), we need not reach the State's claims that Arthur (1) could have raised his ineffective-
trial-counsel claims on direct review and was not precluded by Alabama law at that time from
doing so; (2) could have asked for court-appointed collateral counsel but never did; (3) expressly
chose not to invoke Alabama's procedures to have collateral counsel appointed; and (4) in any
event, has not demonstrated a substantial claim of ineffective trial counsel as required under the
Martinez rule.

52

"extraordinary circumstance" threshold, there is no material distinction between Howell and Arthur's case.  In any event, we hold that, even assuming the Martinez rule applied and affected equitable tolling of AEDPA's statute of limitations, that change in decisional law did not create an extraordinary circumstance for purposes of Rule 60(b)(6) in Arthur's case.

## IV.  CONCLUSION

The Martinez rule did not change the law in any way related to Arthur's case.  Even assuming that the Martinez rule changed or even affected in some way the decisional law about AEDPA's statute of limitations and equitable tolling, any such change in law is not an extraordinary circumstance warranting relief under Rule 60(b)(6).

The district court did not abuse its discretion in denying Arthur's Rule 60(b) motion.  Accordingly, the denial of Arthur's motion for relief from judgment in his § 2254 petition is **AFFIRMED**.

53